JUSTIN D. SANTAGATA, ESQ.
NJ ATTY ID 000822009
COOPER LEVENSON P.C.
1125 Atlantic Avenue
Atlantic City, New Jersey 08052
T: 609-247-3121
E: jsantagata@cooperlevenson.com
Attorneys for Plaintiff

| | |
|---|---|
| KURTIA THOMAS,<br><br>          Plaintiff,<br><br>v.<br><br>PONCE FINANCIAL GROUP INC., MORTGAGE WORLD BANKERS INC.,<br><br>          Defendants. | UNITED STATES DISTRICT COURT<br>DISTRICT OF NEW JERSEY<br>NEWARK VICINAGE<br><br>DOCKET: TBD<br><br>CIVIL ACTION<br><br>**COMPLAINT FOR WHISTLEBLOWING RETALIATION** |

Pursuant to Fed.R.Civ.P. 8, Plaintiff alleges as follows.

## INTRODUCTION

1.  Plaintiff Kurtia Thomas is a former employee of Ponce Financial Group Inc., known as "**Ponce Bank**" and its subsidiary, Mortgage World Bankers Inc. "**MWB**." Ponce Bank and MWB are together referred to as "**Ponce Bank**" unless otherwise distinguished. On June 10, 2022, Ponce Bank fired Ms. Thomas less than 24 hours after she complained internally about numerous alleged fraudulent practices at Ponce Bank. She was fired by the two superiors she complained about. In obvious pretext and gaslighting, Ponce Bank terminated Ms. Thomas for the very things she complained about a day prior, and had complained about numerous times previously, including misrepresentations in mortgage refinancing, conflicts of

interest with loan officers, and violation of rules and guidance from the Federal Housing Finance Agency.

2. Ponce Bank's termination of Ms. Thomas violated the New Jersey Conscientious Employee Protection Act ("**CEPA**").

## PARTIES

3. Ms. Thomas is a resident of and domiciled in New Jersey.

4. Ponce Bank is incorporated and has its principal place of business in New York.

5. MWB is incorporated and has its principal place of business in New York.

## SUBJECT MATTER JURISDICTION AND VENUE

6. The federal district court for New Jersey, Newark vicinage, has subject matter jurisdiction and venue over this litigation because: (i) it arises between citizens of different states; (ii) the amount in controversy exceeds $75,000; and (iii) Ms. Thomas resides in Pisacataway, New Jersey and Ponce Bank has a branch in Union City, New Jersey.

## FACTUAL BACKGROUND

7. Ms. Thomas was hired by MWB on October 25, 2021 as an underwriter.

8. In or around January 2022, Ponce Bank purchased MWB and thereafter owned and controlled MWB, to the extent MWB continued to exist at all. Ms. Thomas was paid by Ponce Bank, given a Ponce Bank handbook, and managed by Ponce Bank. Her salary at Ponce Bank was $115,000 per year.

9. Ms. Thomas worked entirely remotely for Ponce Bank from New Jersey. As an underwriter, she reviewed mortgages, re-financings, and sale of mortgages to third-party banks across the country.

10. After only a few weeks working with Ponce Bank, Ms. Thomas began to notice certain troubling practices. She initially raised her concerns orally with supervisors, senior vice president Heidi Ciuffetelli and manager Ruth Revilla. These concerns included a loan officer using her son as an attorney on loans and purposeful removal of documents from a mortgagor's file so that the mortgage could be sold to a third party without knowing certain facts or to avoid legal limitations on the sale of the mortgage.

11. As these troubling practices continued, and Ms. Thomas began to notice more, she emailed Ms. Ciuffetelli on February 24, 2022 and stated she had "brought a few concerns up previously and it appears they are not being addressed or heard by management." Ms. Thomas asked for a "private conversation." Ms. Ciuffetelli responded: "I don't think private conversations are appropriate." On February 25, 2022, Ms. Thomas had a meeting to discuss her concerns with Ms. Revilla, whose nieces are processors for Ponce Bank and made errors that caused Ponce Bank to be unable to sell some mortgages, the same purported reason Ms. Thomas was fired. Immediately after, Ms. Thomas was issued an "oral warning," which contained pre-textual statements, such as that Ms. Thomas wrongly marked a mortgage as owner-occupied, but that mortgage did not originate with Ms. Thomas and Ms. Thomas corrected the mortgage on or around February 7, 2022 after a meeting with Ms.

Revilla. It was a non-issue until Ms. Thomas complained on February 25, 2022, at which point an "oral warning" was rendered— reduced to writing— stating inexplicably that "the issue was not dealt with timely and brought to management's attention…" This is false.

12. On or around March 7, 2022, Ms. Thomas informed Ms. Revilla that a mortgagor was not eligible for refinance because the mortgagor had not made 3 consecutive payments after exiting forbearance. The 3-consecutive-payments rule was promulgated by the Federal Housing Finance Agency and applies to loans backed or owned by "Fannie Mae" or "Freddie Mac."[1] Ms. Revilla informed Ms. Thomas to immediately remove documents from the mortgagor's file showing the forbearance so that the refinance could be cleared. Ms. Thomas sent an email on March 8, 2022 to Ms. Revilla confirming that she had instructed Ms. Thomas to remove the "mtg statement" from the mortgagor's file. Ms. Revilla responded "[y]es."

13. Separately, Ms. Thomas complained to Ms. Revilla about a mortgage that was being packaged for sale that did not satisfy Federal Housing Finance Agency requirements for such sale because it had numerous discrepancies in income and occupancy for the mortgagor(s). The buyer would ultimately be Flagstar Bank. Ms. Thomas suspended the mortgage sale process, but she was ordered to complete it by Ms. Revilla. Flagstar Bank subsequently informed Ponce Bank that the mortgage sale was under investigation and it flagged the same concerns that Ms. Thomas had

---

[1] See 2020 WL 2538474 (May 19, 2020).

raised. Ironically, and in an apparent attempt to confirm its own liability, Ponce Bank listed Flagstar Bank's concerns as one of the reasons *for Ms. Thomas' termination*.

14. On May 16, 2022, Ms. Thomas emailed human resources about elevating her concerns of fraudulent activity at Ponce Bank. She was assured there would be no retaliation. Ms. Thomas ultimately expressed her concerns further in an email to human resources on June 9, 2022:

> Hi Melissa,
>
> I just wanted to touch back with you regarding what we've previously discussed.
>
> I've been working the past few weeks, trying to cope with how things are handled here at Ponce Bank but the fraudulent activity continues and it's coming back to me which is a big problem. There are numerous files I can point out over the past few months that have blatant fraud. We just received a file which was flagged by one of the investors [Flagstar Bank] by their senior fraud investigator. I brought this file to my manager, Ruth Revilla, attention at the time of submission and advised her that not only the ratios were off but the borrower had no current housing expenses. I also questioned the income and suspended the file due to ineligibility.
>
> Ruth reviewed the file, called me and asked me to proceed stating the borrower did qualify and what documents would be acceptable. Majority of the items the fraud investigator picked up on were in my original suspense notice. Heidi sent me an email last week with the original email from the investor stating fraud was detected and pointed out all of the items that were suspicious.
>
> Another incident is a couple of weeks back Victoria Zeitoune provided a homeowner's declaration's page where the premium amount was 2540. That premium along with the taxes set the borrower's DTI over 50. I brought this to Heidi Ciuffetelli's attention and she ignored my email where I clearly pointed out that the second policy, which was significantly less but had the same coverage as the more expensive policy, was fraudulent. I also sent her the proof in another email where I confirmed with the policy writer what the premium amount was.

> I have quite a few other examples but I wanted to really voice my concerns as not only is this unethical and against banking laws but this is also very stressful and causes great anxiety for me. I'm being told to do things that I know are against the law and when they blow up Heidi comes back to me as if I'm not being told otherwise. It puts me in a very awkward and stressful position because I feel like if I'm not doing what I'm told, I'm being reprimanded and my job is threatened but on the other hand, I could get in a lot of trouble allowing this fraud to go through. I've tried bringing this to Heidi's attention more than once, before my first write up and she told me that private conversations are not necessary. A few days later I was written up. She stated loan officers complained about me, but they are complaining because they are all down with the fraud. I've picked up on so many things and when I bring it to managements' attention, I'm ignored or told that I'm inexperienced. I've been in this industry for 15 years and have never had this issue before.

15. The two supervisors she primarily complained about, Ms. Ciuffetelli and Ms. Revilla, were immediately added to the email thread. Human resources said that it would "investigate." Its "investigation" occurred in approximately 12 hours and included numerous falsehoods, the most egregious alleging that Ms. Thomas was responsible for the problems with Flagstar Bank— the investor referred to in the email above— when she was the one who suspended the mortgage sale process *because of those problems*. Human resources inexplicably wrote in its "investigation" that "the record does not reflect that you expressed concerns about fraudulent information or eligibility issues" related to the Flagstar Bank. *Ms. Thomas suspended the mortgage sale process because of those issues* and was then ordered to continue by Ms. Revilla. The "investigation" admits that a "suspense letter" was generated, but conveniently fails to state that Ms. Thomas *generated it*.

16. In its "investigation" of Ms. Thomas' concerns about possible false or misrepresentative insurance binders on a mortgage, Ponce Bank stated it was not

"unusual for "borrowers [to] obtain insurance binders and later discover the Bank will require higher minimum coverage." This statement, among many others, evidences how flimsy and half-hearted the "investigation" was. The mortgage being discussed in this part of the "investigation" first had a *higher premium with the same coverage, then a lower premium with the same coverage a month later*, the opposite of what the "investigation" is addressing and what Ms. Thomas complained about. On May 18, 2022, Ms. Thomas had provided documentation via email to Ms. Ciuffetelli and Ms. Revilla for her concern about the insurance binders, which was ignored.

17. On June 10, 2022, Ms. Thomas was required to attend a remote meeting with Ms. Ciuffetelli and Ms. Revilla at 11:30am— again: the two she complained about the most— and she was fired. She was sent a hastily-prepared document listing alleged "deficiencies" in her performance, including for the Flagstar Bank mortgage sale. She was told in the remote meeting that the decision to terminate her was made before her June 9, 2022 complaint to human resources. This appears to be blatantly false. There is no record of any such decision, no follow-up on the prior "oral warning," and no further discipline of Ms. Thomas after it until the termination. The "memo" terminating Ms. Thomas was conveniently written by Ms. Ciuffetelli and Ms. Revilla, not human resources. In a pre-planned sequence of events, Ms. Thomas received the results of human resources' "investigation" at 11:05am the same day as her termination, less than 30 minutes before the remote meeting where she was terminated.

18. Numerous other underwriters had known and documented mistakes against them worse than those alleged against Ms. Thomas, including Ms. Revilla's nieces, and occurring over a longer period of time, but they were not fired. Ponce Bank issues "QC" reports documenting alleged "closing defects" on mortgages. These reports establish similar or worse defects than alleged against Ms. Thomas, including some of the same the defects for which she was terminated. For example, a January "QC report" lists 4 separate defects on a single mortgage, but there is no record of any warning or discipline of the underwriter. The same is true for at least 4 other "QC reports" available to Ms. Thomas.

## COUNT ONE
## VIOLATION OF CEPA
## (N.J. Stat. Ann. § 34:19-1 et seq.)

19. Ms. Thomas repeats and re-alleges the preceding paragraphs.

20. CEPA prohibits an employer from taking retaliatory action because an employee discloses or threatens to disclose to a supervisor an activity, policy, or practice of the employer that employee reasonably believes is a violation of law, regulation, or public policy, or is fraudulent or criminal, including deception or misrepresentation to an investor.

21. Ms. Thomas complained to Ponce Bank about activities and practices that she believed, in good faith, were violations of law, regulation, or public policy, and were fraudulent or criminal. These complaints implicated numerous statutes and regulations, including but not limited to: securities fraud, wire fraud, bank fraud, and

statutes and regulations governing the requirements for resale of mortgages when the mortgage is being sold to or backed by "Freddie Mac" or "Fannie Mae."

22. Defendants violated CEPA when they took retaliatory action against Ms. Thomas for her complaints. Ms. Thomas was fired because of her complaints.

## COUNT TWO (IN THE ALTERNATIVE)
## NEW YORK WHISTLEBLOWER VIOLATION
## (N.Y. Lab. Law § 740)

23. Ms. Thomas repeats and re-alleges the preceding paragraphs.

24. N.Y. Lab. Law § 740 provides analogous protections to CEPA, but for New York employees.

25. Ms. Thomas' complaint is subject to New Jersey law and CEPA because she was terminated in New Jersey, her complaints about conduct at Ponce Bank affected New Jersey residents, and her complaints to Ponce Bank were made from New Jersey. However, if Ms. Thomas' complaint is subject to New York law, then Ponce Bank violated N.Y. Lab. Law § 740 when it took retaliatory action against Ms. Thomas for her complaints for the reasons set forth above.

## DEMAND FOR RELIEF

Ms. Thomas demands reliefs as follows:

(i)     Compensatory damages, including back pay and front pay

(ii)    Emotional distress damages

(iii)   A civil penalty of at least $10,000 under CEPA or N.Y. Lab. Law § 740

(iv)    Attorneys' fees and costs

(v)     Punitive damages measured not just by damage to Ms. Thomas but damage to investors and clients of Ponce Bank

(vi)     Such other relief as available under CEPA or N.Y. Lab. Law § 740 and as the court deems equitable and just.

### JURY DEMAND PURSUANT TO FED.R.CIV.P. 38(b)

Plaintiff demands trial by jury on all issues so triable.

### CERTIFICATION PURUSANT TO L.CIV.R. 11.2

I certify that the matter in controversy is not the subject of any other pending, to my knowledge. I further certify that I am aware of no other parties who should be joined in this matter.

Dated: August 22, 2022

                                                                                                              JUSTIN D. SANTAGATA, ESQ.
                                                                                                                        FOR PLAINTIFF